Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHKAN FARAZMAND, derivatively on behalf of BIRD GLOBAL, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| TRAVIS VANDERZANDEN, YIBO LING, ROELOF F. BOTHA, DANIEL FRIEDLAND, NATHANIEL JUSTIN KAN, ROBERT KOMIN, JAMES MUTRIE, RACQUEL RUSSELL, DAVID SACKS, SCOTT MCNEILL, CHRIS CARTER, SCOTT GIESELMAN, SAM STOUTNER, PHILIP J. DEUTCH, RAY KUBIS, and PRECIOUS WILLIAMS OWODUNNI, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| BIRD GLOBAL, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## INTRODUCTION

Plaintiff Ashkan Farazmand ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Bird Global, Inc. ("Bird" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Travis VanderZanden ("VanderZanden"), Yibo Ling ("Ling"), Roelof F. Botha ("Botha"), Daniel Friedland ("Friedland"), Nathaniel Justin Kan ("Kan"), Robert Komin ("Komin"), James Mutrie ("Mutrie"), Racquel Russell ("Russell"), David Sacks ("Sacks"), Scott McNeill ("McNeill"), Chris Carter ("Carter"), Scott Gieselman ("Gieselman"), Sam Stoutner ("Stoutner"), Philip J. Deutch ("Deutch"), Ray Kubis ("Kubis"), and Precious Williams Owodunni ("Owodunni") (collectively, the "Individual Defendants," and together with Bird, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Bird, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants VanderZanden and Ling for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Bird, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Bird's controlling shareholder, directors, and/or officers from May 14, 2021 through November 14, 2022, both dates inclusive (the "Relevant Period").

2.     Based in Miami, Florida, Bird is an electric vehicle company engaged in the business of providing affordable, environmentally friendly electric bikes and scooters for short-term rental to communities in over 400 cities.

3.     Bird's offerings consist of its core vehicle-sharing business and operations ("Sharing") and its sale of Bird-designed vehicles for personal use. For the years ended December 31, 2021 and 2020, 91% and 85%, respectively, of Bird's total revenue was generated from Bird's Sharing business.

4.     Bird's Sharing business provides riders with on-demand access to Bird vehicles through Bird's mobile application. Revenue is generated in the form of ride fees from trips taken by customers. For a single ride, riders usually pay a standard unlock fee in addition to a per-minute price for each minute the vehicle is unlocked. Once the rider confirms parking compliance, the mobile application processes the payment.

5.     The Company was incorporated under the laws of Delaware on May 4, 2021 as a wholly owned subsidiary of Bird Rides, Inc. ("Bird Rides") for the purpose of entering into the Business Combination Agreement, dated as of May 11, 2021, by and among Switchback II Corporation ("Switchback"), Maverick Merger Sub Inc., a wholly owned subsidiary of Switchback ("Merger Sub"), Bird Rides, and the Company.

6.     Switchback was a special purpose acquisition company ("SPAC") formed on October 7, 2020 to raise money through an initial public offering ("IPO") for the eventual acquisition of an existing company. On January 8, 2021, Switchback's shares began trading on the NYSE under the ticker symbol "SWBK.U." On January 12, 2021, Switchback's IPO was completed, resulting in gross proceeds of approximately $316.3 million.

7.     On November 3, 2021, the Company merged with and into Switchback, with the Company continuing as the surviving entity (the "Business Combination"). On

November 4, 2021, Merger Sub merged with and into Bird Rides, with Bird Rides continuing as the surviving entity and as a wholly owned subsidiary of the Company.

8.      Throughout the Relevant Period, the Individual Defendants caused the Company to improperly record revenue on certain trips completed by customers of the Company's Sharing business. Accordingly, several of the Company's annual and quarterly financial reports filed with the SEC on Form 10-Ks and 10-Qs overstated the Company's Sharing revenue for the relevant fiscal quarters and year during the Relevant Period and also failed to disclose that the Company's internal controls were ineffective as they related to the recognition of Sharing revenue.

9.      The truth emerged on November 14, 2022 when the Company issued a press release announcing that its disclosure controls and procedures were not effective at a reasonable assurance level due to a material weakness in connection with the preparation of the Company's financial statements related to its business system configuration that impacted the recognition of revenue on certain trips completed by customers of the Company's Sharing business for which collectability was not probable. For certain customers with insufficient preloaded "wallet" balances, the Company's business systems improperly recorded revenue for uncollected balances that should not have been recorded, resulting in an overstatement of Sharing revenue and an understatement of deferred revenue.

10.      The November 14, 2022 press release specifically stated that the following of the Company's financial statements included in the Company's required periodic reports filed with the SEC should no longer be relied upon: (1) its audited consolidated financial statements as of December 31, 2021 and 2020, and for the years then ended, and quarterly periods within those years, included in the 10-K filed on March 15, 2022; (2) its condensed consolidated financial statements as of March 31, 2022, and for the three months then ended, included in the 10-Q filed on May 16, 2022; and (3) its condensed consolidated financial statements as of June 30, 2022, and for the three and six months then ended,

included in the 10-Q filed on August 15, 2022, and each quarterly or annual period covered therein (collectively, the "Original Filings"). The November 14, 2022 press release also stated that any previously furnished or filed reports, related earnings releases, investor presentations or similar communications of the Company describing its financial results contained in the Original Filings should no longer be relied upon. The press release further stated that the Company was in the process of designing and implementing controls to remediate the deficiencies.

11.     On this news, the Company's share price dropped $0.069 (or 15.9%) from a close of $0.433 per share on Friday, November 11, 2022 to a close of $0.364 per share on Monday, November 14, 2022.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was inaccurately recording Sharing revenue on certain trips taken by customers of the Company's Sharing business; (2) as a result, the Company was overstating its Sharing revenue to the investing public; (3) the Company's internal controls were ineffective and inadequate in terms of accurately recording and reporting Sharing revenue; (4) accordingly, the Company was in need of restating the Sharing revenue it reported as having earned in its SEC filings throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

15.     Moreover, during the Relevant Period, one of the Individual Defendants breached his fiduciary duties by engaging in insider sales for proceeds of $474,578.

16.     In light of the Individual Defendants' misconduct, which has subjected the Company, the Chairman of Bird's Board of Directors (the "Board"), and its former Chief Financial Officer ("CFO") to being named as defendants in a consolidated federal securities class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's Chair of the Board's and former CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Bird's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act

(15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

19.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

23.    Venue is proper in this District because Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.    Plaintiff is a current shareholder of Bird. Plaintiff has continuously held Bird common stock at all relevant times.

### Nominal Defendant Bird

25.    Bird is a Delaware corporation with its principal executive offices at 392 NE 191st Street #20388, Miami, Florida 33179. Bird's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BRDS."

### Defendant VanderZanden

26.    Defendant VanderZanden has served as the Company's Chairman of the Board since November 4, 2021. He served as the Company's President from November 4, 2021 until June 29, 2022. He also served as the Company's Chief Executive Officer ("CEO") from November 4, 2021 until September 21, 2022. Defendant VanderZanden

founded Bird Rides in 2017, and previously served as President and CEO and as a director of Bird Rides from 2017 until November 4, 2021. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 26, 2022 (the "2022 Proxy Statement"), as of April 13, 2022, Defendant VanderZanden beneficially owned 35,657,642 shares of the Company's common stock, which represented 12.8% of the Company's outstanding shares of common stock on that date. As Defendant VanderZanden's beneficial ownership of Company stock entitles him to a combined voting power of 74%, he is considered a controlling shareholder. Given that the price per share of the Company's common stock at the close of trading on April 13, 2022 was $2.10, Defendant VanderZanden owned approximately $74.9 million worth of Bird stock.

27.    For the fiscal year ended December 31, 2021, Defendant VanderZanden received $155,740,116 in total compensation, including $1,116 in salary, $155,738,700 in stock awards, and $300 in all other compensation.

28.    The Company's 2022 Proxy Statement stated the following about Defendant VanderZanden:

> Travis VanderZanden has served as our President and Chief Executive Officer since the consummation of the Business Combination, and serves as the Chair of our Board of Directors. Mr. VanderZanden is also the founder of Bird Rides, and has served as President and Chief Executive Officer, and as a director of Bird Rides since 2017. Prior to founding Bird Rides, Mr. VanderZanden held several leadership positions in the ride-sharing and transportation industries, serving as Chief Operating Officer of Lyft and as a Vice President at Uber. Mr. VanderZanden also founded the on-demand car washing company, Cherry, which was acquired by Lyft, and was Chief Revenue Officer and the first hire at Yammer, a business software company acquired by Microsoft. Mr. VanderZanden has long been inspired to work on last-mile transportation solutions in large part because of his lifelong admiration for his mother, who drove a public bus for more than 30 years in his home state of Wisconsin. Mr. VanderZanden has an MBA from the University of Southern California and a B.S. in Business Administration from the University of Wisconsin, Eau Claire. We believe that Mr. VanderZanden is qualified to serve on our Board

because of his experience founding and leading Bird Rides, and extensive experience in the ride-sharing and transportation industries.

**Defendant Ling**

29.     Defendant Ling served as the Company's CFO from November 4, 2021 until September 21, 2022. He previously served as Bird Rides' CFO from April 2019 until November 4, 2021 and as Bird Rides' Vice President, Business & Corporate Development from October 2018 until April 2019. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Ling beneficially owned 3,076,989 shares of the Company's common stock, which represented 1.2% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 13, 2022 was $2.10, Defendant Ling owned approximately $6.5 million worth of Bird stock.

30.     For the fiscal year ended December 31, 2021, Defendant Ling received $18,455,391 in total compensation, including $300,000 in salary, $18,153,891 in stock awards, and $1,500 in all other compensation.

31.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ling made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| September 6, 2022 | 200,365 | $0.43 | $85,555 |
| May 27, 2022 | 496,203 | $0.78 | $389,023 |

Thus, in total before the fraud was exposed, he sold 696,568 Company shares on inside information, for which he received $474,578. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.     The Company's 2022 Proxy Statement stated the following about Defendant Ling:

Yibo Ling has served as our Chief Financial Officer since the consummation of the Business Combination. Prior to the Business

Combination, Mr. Ling served as Chief Financial Officer of Bird Rides since April 2019, and as Vice President, Business & Corporate Development of Bird Rides from October 2018 to April 2019. Mr. Ling oversees the Company's accounting, tax, treasury, financial planning, and analysis functions. Prior to joining Bird Rides in October 2018, Mr. Ling spent four years in the ride-sharing industry as Uber's Director of Corporate Development, managing corporate strategy, mergers and acquisitions, and Uber's global expansion to China. Mr. Ling previously worked as a Project Leader at the Boston Consulting Group, where he helped technology and financial services clients operate more efficiently. Mr. Ling received a PhD in Medical and Electrical Engineering and a M.S. in Electrical Engineering and Computer Science from The Massachusetts Institute of Technology, and a B.S. in Biomedical Engineering from the University of Michigan.

**Defendant Botha**

33.    Defendant Botha served as a Company director from November 4, 2021 until December 19, 2022. He previously served as a director of Bird Rides from 2018 until November 4, 2021. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Botha beneficially owned 33,639 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2022 was $2.10, Defendant Botha owned approximately $70,642 worth of Bird stock.

34.    The Company's 2022 Proxy Statement stated the following about Defendant Botha:

Roelof F. Botha has served on our Board since the consummation of the Business Combination, and prior to the Business Combination served as a director of Bird Rides since 2018. Since January 2003, Mr. Botha has served in various positions at Sequoia Capital, a venture capital firm, including as a Managing Member since 2007 and most recently, as Senior Steward of the firm's global brand and operations beginning in July 2022. From 2000 to 2003, Mr. Botha served in various positions at PayPal, a payment processing and financial services company, including as Chief Financial Officer. Mr. Botha has served on the board of directors of Eventbrite, Inc., a global platform for live experiences, since 2009, MongoDB, a cross-platform database program, since 2013, Square, Inc. a provider of payment processing and financial and

marketing services, since 2011, Unity Software, Inc., a company that provides a 3D and VR content development platform, since 2009, and Natera, a genetic testing company, since 2007. He also currently serves on the boards of directors of a number of privately held companies. Mr. Botha previously served on the board of directors of Xoom Corporation from May 2005 until its acquisition by PayPal in 2015. Mr. Botha holds an MBA from the Stanford University Graduate School of Business and a B.S in Actuarial Science, Economics and Statistics from the University of Cape Town. We believe that Mr. Botha is qualified to serve as a member of our Board due to his history with Bird Rides, knowledge of the micromobility industry, and experience serving on the boards of directors of public companies.

**Defendant Friedland**

35.     Defendant Friedland served as a Company director from November 4, 2021 until December 19, 2022. He previously served as a director of Bird Rides from 2017 until November 4, 2021. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Friedland beneficially owned 19,685,378 shares of the Company's common stock, which represented 8.1% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 13, 2022 was $2.10, Defendant Friedland owned approximately $41.3 million worth of Bird stock.

36.     The Company's 2022 Proxy Statement stated the following about Defendant Friedland:

> Daniel Friedland has served on our Board since the consummation of the Business Combination, and prior to the Business Combination served as a director of Bird Rides since 2017. Mr. Friedland is the co-founder and Managing Director of Goldcrest Capital, a venture capital fund. Previously, Mr. Friedland was an attorney and partner at the law firm Orrick, Herrington & Sutcliffe LLP. Mr. Friedland received his B.A. from Stanford University, graduating Phi Beta Kappa, and his J.D. from Stanford Law School. We believe that Mr. Friedland is qualified to serve as a member of our Board due to his history with Bird Rides and knowledge of the micromobility industry.

**Defendant Kan**

37.    Defendant Kan served as a Company director from November 4, 2021 until September 21, 2022. He previously served as a director of Bird Rides from 2017 until November 4, 2021. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Kan beneficially owned 582,830 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2022 was $2.10, Defendant Kan owned approximately $1.2 million worth of Bird stock.

38.    The Company's 2022 Proxy Statement stated the following about Defendant Kan:

> Nathaniel Justin Kan has served on our Board since the consummation of the Business Combination, and prior to the Business Combination served as a director of Bird Rides since 2017. Mr. Kan is an American Internet entrepreneur and investor best known as the cofounder of Twitch, the internet live video streaming platform. In 2006, Mr. Kan launched the live video service Justin.tv, a company that started when he strapped a camera to his head and streamed his life to the internet 24/7. Over the next eight years, through twists and turns, he and his cofounders turned the business into Twitch, ultimately selling to Amazon in 2014 for $970 million. From 2017 to 2020, Mr. Kan was the Chief Executive Officer of Legal Technology Services Inc. Mr. Kan has served as a Partner at Goat Capital since 2020 and as a director of ScriptDash Inc. (dba Alto Pharmacy) since 2015, Flirtey Inc. since 2018, Long Game Inc. since 2020, ZeroCater Inc. since 2017, Scotty Inc. since 2017, and Vy Global Growth since 2020. Mr. Kan holds a B.A. in Physics and Philosophy from Yale University. We believe that Mr. Kan is qualified to serve as a member of our Board due to his history with Bird Rides and his experience building consumer internet businesses at scale and investing across a broad number of technology sub-sectors.

**Defendant Komin**

39.    Defendant Komin has served as a Company director since November 4, 2021. He previously served as a director of Bird Rides from June 2021 until November 4, 2021. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Komin

beneficially owned 33,333 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2022 was $2.10, Defendant Komin owned approximately $70,000 worth of Bird stock.

40.     For the fiscal year ended December 31, 2021, Defendant Komin received $741,767 in total compensation, including $16,767 in fees earned or paid in cash and $725,000 in stock awards.

41.     The Company's 2022 Proxy Statement stated the following about Defendant Komin:

> Robert Komin has served on our Board since the consummation of the Business Combination, and prior to the Business Combination served as a director of Bird Rides since June 2021. Mr. Komin also serves as our Lead Independent Director. Mr. Komin previously served as Chief Financial Officer of Sunrun Inc., the leading residential solar and storage company in the United States, from March 2015 through May 2020, and then continued as a consultant until January 2021. From September 2013 to January 2015, Mr. Komin served as Chief Financial Officer at Flurry, Inc., a mobile analytics and advertising company. From August 2012 to August 2013, Mr. Komin served as Chief Financial Officer at Ticketfly, Inc., a music ticketing and marketing services provider. From January 2010 to July 2012, Mr. Komin served as Chief Operating Officer and Chief Financial Officer at Linden Research, Inc., a creator of virtual digital entertainment and cybercurrency. Previously, Mr. Komin served as Chief Financial Officer at Solexel, Inc., a thin-silicon solar company, Tellme Networks, Inc., a speech recognition applications company, and XOR, Inc., a business application solution provider. Mr. Komin serves as a member of the Board of Trustees of the University of Oregon Foundation, as its audit and risk committee chairman, and as a member of its executive and investment committees. Mr. Komin holds a B.S. in Accounting and General Science from the University of Oregon and an MBA from Harvard Business School. We believe that Mr. Komin is qualified to serve as a member of our Board due to his history with Bird Rides, financial expertise and extensive experience with public companies.

**Defendant Mutrie**

42.     Defendant Mutrie has served as a Company director since November 4, 2021. He co-founded Switchback in 2020 and previously served as Switchback's Co-CEO from December 2020 until November 4, 2021 and as a director of Switchback from October 2020 until November 4, 2021. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Mutrie beneficially owned 14,409,889 shares of the Company's common stock, which represented 5.9% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 13, 2022 was $2.10, Defendant Mutrie owned approximately $30.3 million worth of Bird stock.

43.     The Company's 2022 Proxy Statement stated the following about Defendant Mutrie:

James E. Mutrie has served on our Board since the consummation of the Business Combination. Previously, Mr. Mutrie was one of the co-founders of Switchback and was its Co-Chief Executive Officer since December 2020 and a member of its board of directors since October 2020, in each case, until consummation of the Business Combination. Mr. Mutrie co-founded and serves as Co-Chief Executive Officer and a member of the board of directors of Switchback III Corporation. Mr. Mutrie also co-founded and served as Chief Commercial Officer, General Counsel, Secretary and a member of the board of directors of Switchback Energy Acquisition Corporation until the closing of its business combination with ChargePoint, Inc., an electric vehicle charging network provider committed to enabling the electrification of mobility for all people and goods. Mr. Mutrie served as Vice President, General Counsel, and Corporate Secretary of RSP Permian, Inc. from June 2014 through the completion of the acquisition of RSP by Concho Resources, Inc. in July 2018. Prior to RSP, Mr. Mutrie served as General Counsel and Compliance Officer at United Surgical Partners International. From October 2003 to January 2007, Mr. Mutrie practiced corporate law at Vinson & Elkins L.L.P., representing public and private companies in mergers and acquisitions and capital market offerings. Mr. Mutrie holds a B.A. from Cornell University, a J.D. from Northwestern University School of Law, a Certificate in Financial Management from Cornell University, and a Certificate in Financial Skills from SMU Cox School of Business, Executive Education. We

believe that Mr. Mutrie's extensive experience in managing public company mergers and acquisitions, financing transactions and corporate governance, including helping to grow a public company from its initial public offering to mid-market, as well as his extensive knowledge of the energy transition industry, brings important and valuable skills to our Board.

**Defendant Russell**

44.    Defendant Russell has served as a Company director since November 4, 2021. She previously served as a director of Bird Rides from February 2021 until November 4, 2021. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Russell beneficially owned 46,882 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2022 was $2.10, Defendant Russell owned approximately $98,452 worth of Bird stock.

45.    For the fiscal year ended December 31, 2021, Defendant Russell received $758,711 in total compensation, including $35,068 in fees earned or paid in cash and $723,643 in stock awards.

46.    The Company's 2022 Proxy Statement stated the following about Defendant Russell:

Racquel Russell has served on our Board since the consummation of the Business Combination, and prior to the Business Combination served as a director of Bird Rides since February 2021. Ms. Russell currently serves as Vice President of Partner Success for the Premier Agent division of Zillow, a role she has held since 2020. From 2015 to 2020, Ms. Russell worked to build out Zillow's government relations and public affairs function. Prior to Zillow, Ms. Russell spent three years in the White House as top advisor to President Barack Obama, focused on building, communicating, and advancing the President's agenda on urban affairs and economic opportunity. Throughout her political career, Ms. Russell also held leadership positions for U.S. Senators Tom Carper and Bob Graham, as well as for the National Governors Association. Ms. Russell holds a B.S. in Communications from the University of Miami, and a J.D. from the George Washington University Law School. We believe that Ms. Russell is qualified to serve as a member of our Board due to her history with Bird Rides,

familiarity with similar business models, and experience navigating regulatory environments and protecting brand reputation.

**Defendant Sacks**

47.     Defendant Sacks served as a Company director from November 4, 2021 until December 19, 2022. He previously served as a director of Bird Rides from 2017 until November 4, 2021. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Sacks beneficially owned 26,982,068 shares of the Company's common stock, which represented 11.0% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 13, 2022 was $2.10, Defendant Sacks owned approximately $56.7 million worth of Bird stock.

48.     The Company's 2022 Proxy Statement stated the following about Defendant Sacks:

> David Sacks has served on our Board since the consummation of the Business Combination, and prior to the Business Combination served as a director of Bird Rides since 2017. Mr. Sacks is General Partner of Craft Ventures, a venture capital firm that he founded in 2017. Previously, Mr. Sacks was founding-era Chief Operating Officer of PayPal, founder/Chief Executive Officer of Yammer (acquired by Microsoft in 2012), and Chief Executive Officer of Zenefits. Mr. Sacks holds a B.A. in Economics from Stanford University and a J.D. from the University of Chicago Law School. In addition to Bird, Mr. Sacks sits on the boards of a number of private companies, including ClickUp, CloudTrucks, Datasembly, OpenPhone, Scratchpad, Sourcegraph, Thrive Cash (DBA X1), Trellis, and Vendr. We believe that Mr. Sacks is qualified to serve as a member of our Board due to his history with Bird Rides and extensive experience with growing and investing in companies.

**Defendant McNeill**

49.     Defendant McNeill served as Co-CEO of Switchback from December 2020 until November 4, 2021 and as a member of the Switchback board from October 2020 until November 4, 2021.

50.     The Company's registration statement filed on May 14, 2021 with the SEC on Form S-4 (the "Registration Statement") stated the following about Defendant McNeill:

> Co-Chief Executive Officer and Director. Mr. McNeill is one of our co-founders and has been our Co-Chief Executive Officer since December 2020 and a member of the Switchback Board since October 2020. Mr. McNeill co-founded and serves as Co-Chief Executive Officer and a member of the board of directors of Switchback III. Mr. McNeill also co-founded and served as Chief Executive Officer, Chief Financial Officer and a member of the board of directors of Switchback I until the closing of its business combination with ChargePoint. Mr. McNeill served as Chief Financial Officer of RSP from April 2013 through the completion of its acquisition by Concho in July 2018. Mr. McNeill also served as a member of the board of directors of RSP from December 2013 through July 2018. Mr. McNeill joined RSP prior to its initial public offering in January 2014 and helped build the organization during its early growth phase while positioning it for its initial public offering. During Mr. McNeill's tenure at RSP, RSP executed over $13 billion in M&A transactions and approximately $7 billion of financings. Before joining RSP, Mr. McNeill served as a managing director in the energy investment banking group of Raymond James Financial, Inc., advising companies operating in the exploration and production, midstream, and energy service and equipment segments of the energy industry. Mr. McNeill holds a B.B.A from Baylor University and an M.B.A from The University of Texas at Austin and is a certified public accountant in the State of Texas.

**Defendant Carter**

51.     Defendant Carter served as a member of the Switchback board from December 2020 until November 4, 2021.

52.     The Company's Registration Statement stated the following about Defendant Carter:

> Director. Mr. Carter has been a member of the Switchback Board since December 2020. Since January 2021, Mr. Carter has served as a member of the board of directors of Switchback III. Mr. Carter served as a member of the board of directors for Switchback I from May 2019 until the closing of its business combination with ChargePoint. Mr. Carter joined NGP in 2004 and currently serves as Managing Partner and as a director of certain private NGP portfolio companies.

16

Prior to joining NGP, Mr. Carter was an analyst with Deutsche Bank's Energy Investment Banking group in Houston, where he focused on financing and merger and acquisition transactions in the oil and gas and oilfield services industries. Mr. Carter served on the Board of Directors of PennTex Midstream GP, LLC from June 2015 until November 2016 and on the Board of Directors of Parsley Energy, Inc. from December 2013 until January 2016. Mr. Carter also served on the Board of Directors of Rice Energy, Inc. from October 2013 through November 2014. Mr. Carter received a B.B.A. and an M.P.A. in Accounting, summa cum laude, in 2002 from The University of Texas at Austin, where he was a member of the Business Honors Program. He received an M.B.A. in 2008 from Stanford University, where he graduated as an Arjay Miller Scholar.

**Defendant Gieselman**

53.     Defendant Gieselman served as a member of the Switchback board from December 2020 until November 4, 2021.

54.     The Company's Registration Statement stated the following about Defendant Gieselman:

Director. Mr. Gieselman has been a member of the Switchback Board since December 2020. Since January 2021, Mr. Gieselman has served as a member of the board of directors of Switchback III. Mr. Gieselman served as a member of the board of directors for Switchback I from May 2019 until the closing of its business combination with ChargePoint. Mr. Gieselman has served as a Partner for NGP since April 2007. Mr. Gieselman serves as a director of certain private NGP portfolio companies. Prior to joining NGP, Mr. Gieselman worked in various positions in the investment banking energy group of Goldman Sachs & Co. LLC, where he became a partner in 2002. He has served on the board of directors of HighPoint Resources Corporation since March 2018. Mr. Gieselman served on the board of directors of WildHorse Resource Development Corporation from September 2016 until it was acquired by Chesapeake Energy Corporation in February 2019 and served on the board of directors of Chesapeake Energy Corporation from May 2019 to November 2019. Mr. Gieselman also served as a member of the board of directors of Rice Energy, Inc. from January 2014 until April 2017 and was a member of the board of directors of Memorial Resource Development Corp. from its formation until it was acquired by Range Resources Corporation in September 2016. In

addition, Mr. Gieselman served as a member of the board of directors of Memorial Production Partners GP LLC from December 2011 until March 2016. Mr. Gieselman received a B.S. in 1985 and an M.B.A. in 1988 from Boston College.

**Defendant Stoutner**

55.    Defendant Stoutner served as a member of the Switchback board from December 2020 until November 4, 2021.

56.    The Company's Registration Statement stated the following about Defendant Stoutner:

> Director. Mr. Stoutner has been a member of the Switchback Board since December 2020. Since January 2021, Mr. Stoutner has served as a member of the board of directors of Switchback III. Mr. Stoutner served as a member of the board of directors for Switchback I from May 2019 until the closing of its business combination with ChargePoint. Mr. Stoutner joined NGP in 2011 and currently serves as Partner and as a director of certain private NGP portfolio companies. Prior to joining NGP, Mr. Stoutner was an investment banking analyst with Madison Williams and Company's Energy Investment Banking Group in Houston, where he focused on financing and merger and acquisition transactions in the oil and gas industry. Mr. Stoutner received a B.B.A. and M.P.A. in Accounting, summa cum laude, in 2010 from The University of Texas at Austin. He received an M.B.A. in 2016 from Stanford University.

**Defendant Deutch**

57.    Defendant Deutch served as a member of the Switchback board from December 2020 until November 4, 2021.

58.    The Company's Registration Statement stated the following about Defendant Deutch:

> Director. Mr. Deutch has been a member of the Switchback Board since December 2020. Since January 2021, Mr. Deutch has served as a member of the board of directors of Switchback III. Mr. Deutch currently serves as a Partner of NGP and serves as Chief Executive Officer of NGP ETP III, a portfolio company of NGP XII that invests in companies with products, services, or technologies in the areas of renewable energy, power, energy storage, environmental, energy

efficiency and transportation. Mr. Deutch founded NGP ETP in 2005 and has been investing in the energy technology sector since 1997. Mr. Deutch managed NGP ETP and NGP Energy Technology Partners II, two private equity funds affiliated with NGP, which invested in companies that provide products and services to the oil and gas, power, environmental, energy efficiency and alternative energy sectors. From 2015 to 2018, Mr. Deutch was Partner, COO, and President of Social Capital, a $1.8 billion Silicon Valley-based investment firm, where he helped launch SC Public Equity Partners and Social Capital Hedosophia Holdings Corp. (NYSE:IPOA). From 1997 to 2004, Mr. Deutch was Managing Director at Perseus, L.L.C., where he led or co-led the firm's energy investing activities and was a member of the firm's Executive Committee. At Perseus, Mr. Deutch helped launch Perseus CDO I Limited, Perseus Acquisition-Recapitalization Fund and Perseus-Soros Biopharmaceutical Fund, L.P. From 1986 to 1988, Mr. Deutch was a financial analyst in the Mergers & Acquisition Department of Morgan Stanley & Co., Inc. Mr. Deutch is a board member of Form Energy Inc., Voltus Inc., Community Energy Inc. and TPI Composites Inc. (NASDAQ:TPIC) and is a former board member of, among other companies, American Wind Capital, Beacon Power, Evergreen Solar, Renewable Energy Group (NASDAQ:REGI) and SatCon Technologies. Mr. Deutch is a member of the External Advisory Board of the MIT Future of Storage Study, the Board of Governors of the Folger Shakespeare Library and the Board of Trustees of the Menlo School. He previously served on the Boards of the International Center for Women, the Washington Performing Arts Society and Capital for Children. Mr. Deutch holds a J.D. with distinction from Stanford Law School and a B.A. in Economics from Amherst College, where he was elected a member of Phi Beta Kappa.

**<u>Defendant Kubis</u>**

59.    Defendant Kubis served as a member of the Switchback board from January 2021 until November 4, 2021.

60.    The Company's Registration Statement stated the following about Defendant Kubis:

Independent Director. Mr. Kubis has been a member of the Switchback Board since January 2021. Mr. Kubis served as a member of the board of directors of Switchback I from July 2020 until the closing of its business combination with ChargePoint. Mr. Kubis has served as a

director of Gridtential Energy, Inc., an inventor and developer of battery technology ("Gridtential"), since October 2015. Mr. Kubis has served as the Chairman of Gridtential since November 2016. From June 2013 to October 2015, Mr. Kubis served as President, and from June 2013 to January 2020, Mr. Kubis served as a member of the Board of Directors of ECO-BAT Technologies Limited, which collects, recycles and produces products for the battery, mining and other industries. From March 2002 through January 2013, Mr. Kubis served as President—Europe, Middle East and Africa of EnerSys, a manufacturer, marketer and distributor of industrial batteries. From October 1998 to March 2002, Mr. Kubis was Vice President, General Manager, for the Energy Storage Group of Invensys plc. He has also worked in senior leadership positions with Johnson Controls and Exide in the automotive battery industry. Mr. Kubis received his M.B.A. degree from The Wharton School of the University of Pennsylvania and a B.S. degree in Accounting from the University of Illinois.

**Defendant Owodunni**

61.     Defendant Owodunni served as a member of the Switchback board from January 2021 until November 4, 2021.

62.     The Company's Registration Statement stated the following about Defendant Owodunni:

Independent Director. Ms. Owodunni has been a member of the Switchback Board since January 2021. Since 2009, Ms. Owodunni has served as the president of Mountaintop Consulting LLC, a business strategy and branding company that advises leading corporations and financial services, law, and private equity firms. Prior to establishing Mountaintop, Ms. Owodunni was a vice president at Goldman, Sachs & Co., where she made private equity investments in high growth businesses and served on the boards of several portfolio companies. Ms. Owodunni began her Goldman career as an investment banker in the Mergers & Strategic Advisory Group, advising energy, retail and industrial companies on M&A and corporate finance transactions. Ms. Owodunni graduated with honors from Yale University and received a J.D. from Yale Law School. Since 2019, Ms. Owodunni has served as director on the board of directors of Cadence Bancorporation (NYSE:CADE). Ms. Owodunni also currently serves as a board member of the Houston Parks Board and the Episcopal Health Foundation.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

63.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Bird and because of their ability to control the business and corporate affairs of Bird, the Individual Defendants owed Bird and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Bird in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Bird and its shareholders so as to benefit all shareholders equally.

64.     Each controlling shareholder, director, and/or officer of the Company owes to Bird and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Bird, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66.     To discharge their duties, the controlling shareholder, officers, and/or directors of Bird were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and/or officers of Bird, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury

to the Company. The conduct of the Individual Defendants who were also controlling shareholder, officers, and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Bird's Board at all relevant times.

68.    As controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

69.    To discharge their duties, the controlling shareholder, officers, and/or directors of Bird were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and/or directors of Bird were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to Bird's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Bird conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Bird and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Bird's operations would comply with all applicable laws and Bird's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.     Each of the Individual Defendants further owed to Bird and the shareholders the duty of loyalty requiring that each favor Bird's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Bird and were at all times acting within the course and scope of such agency.

72.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Bird, each of the Individual Defendants had access to adverse, non-public information about the Company.

73.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Bird.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, violations of the Exchange Act, and the claims alleged in the Securities Class Action; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

76.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Bird was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

78.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Bird, and was at all times acting within the course and scope of such agency.

### BIRD'S CODE OF CONDUCT AND AUDIT COMMITTEE CHARTER

79.     Bird's Code of Conduct provides that "[a]ll directors and employees are evaluated at the highest standard of business ethics and are expected to conduct themselves according to this Code of Business Conduct and Ethics (the "Code"). We expect our leadership team and People Managers, in particular, to lead by example and always demonstrate integrity."

80.     In a section titled, "Competition and Fair Dealing," the Code of Conduct states the following, in relevant part:

> All employees should endeavor to deal fairly with collaborators, licensors, suppliers and customers, including fellow employees, vendors, Fleet Manager partners, riders and cities, as well as competitors, and all others in the Bird global community. Our employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. Employees should maintain and protect any intellectual property licensed from licensors with the same care as they employ with regard to Company-

developed intellectual property. Employees should also handle the non-public information of our collaborators, licensors, suppliers and customers responsibly and in accordance with our agreements with them, including information regarding their technology and product pipelines.

81.     In a section titled, "Company Records," the Code of Conduct states the following, in relevant part:

Accurate and reliable records are crucial to Bird's business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, customer and partner collaborations, manufacturing and regulatory submissions, agreements with our vendors and other external parties, and includes materials used or created in connection with city Requests for Proposal (RFPs) and permit applications, and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow Bird's applicable document retention policies with respect to Company records within their control. Please contact your manager, the People Team, or the Legal Team to obtain copies of any applicable policies or with any questions concerning any such policies.

82.     In a section titled, "Accuracy of Financial Reports and Disclosures," the Code of Conduct states the following:

As a public company, Bird is subject to various securities laws, regulations, and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding Bird's business, financial condition, and results of operations. Inaccurate, incomplete, or untimely reporting will not be tolerated and can severely damage Bird and result in legal liability.

Bird's principal financial officers and other employees working in the finance department or those working with data or systems affecting financial reporting have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally

accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

83.   In a section titled, "Compliance with Laws and Regulations," the Code of Conduct states the following, in relevant part:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to Bird's operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job or position within the Company.

*   *   *

Consistent with Bird's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in Bird's stock or other securities while in possession of material non-public information about Bird. In addition, Bird employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell Bird's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by Bird, up to and including, for an employee, termination of employment; or, for a director, a request that such director resign from the Board of Directors. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time.

84.   In a section titled, "Public Communications Generally," the Code of Conduct states the following:

Bird highly values its credibility and reputation in the community. What is written or said about Bird in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. Bird has adopted a separate Policy Statement – Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

85.     The Company's Audit Committee Charter also entrusts the Individual Defendants on the Audit Committee with additional responsibilities. The Audit Committee Charter states that the purpose of the Audit Committee is to, in relevant part:

assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's independent auditor; and (v) the design and implementation of the Company's internal audit function, and the performance of the internal audit function after it has been established.

The Committee's responsibilities are limited to oversight.    The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

86.     The Audit Committee Charter also delates the Audit Committee, *inter alia*, with the following responsibilities, in relevant part:

*Form 10-K Review.* The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations.

\*     \*     \*

*Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

\*     \*     \*

*Review of Earnings Releases*.  The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

*Risk Assessment and Risk Management*.  The Committee must review the Company's policies with respect to risk assessment and risk management, including with respect to financial, information security and cybersecurity-related risks.

87.     In violation of the Code of Conduct and the Company's corporate governance documents, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof.  Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records including financial records, disclose accurate and complete information regarding Bird's business, financial condition, and results of operations, and comply with laws and regulations. In violation of the Audit Committee Charter, the Individual Defendants on the Audit Committee failed to fulfill their responsibilities in overseeing, *inter alia*, the integrity of the Company's financial statements and the Company's compliance with legal and regulatory

Verified Shareholder Derivative Complaint

requirements, including reporting and disclosure standards and for preparing the Company's financial statements.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

88.    The Company is focused on disrupting traditional models of transportation by making lightweight electric vehicles such as scooters and bikes readily available to rent or own to cities across the world.

89.    The Company's core Sharing business generates the lion share of the Company's total revenue. For the years ended December 31, 2021 and 2020, 91% and 85%, respectively, of Bird's total revenue was generated from Bird's Sharing business.

90.    Throughout the Relevant Period, the Individual Defendants caused the Company to improperly record revenue on certain trips completed by customers of the Company's Sharing business. Accordingly, several of the Company's annual and quarterly financial reports filed with the SEC on Form 10-Ks and 10-Qs overstated the Company's Sharing revenue for the relevant fiscal quarters and year during the Relevant Period and also failed to disclose that the Company's internal controls were ineffective as they related to the recognition of Sharing revenue.

91.    On November 14, 2022, the Company issued a press release announcing that the Company's financial statements included in the Company's Original Filings should no longer be relied upon. The press release also stated that any previously furnished or filed reports, related earnings releases, investor presentations or similar communications of the Company describing its financial results contained in the Original Filings should no longer be relied upon. The press release further stated that the Company was in the process of designing and implementing controls to remediate the deficiencies.

92.    On this news, the Company's share price dropped $0.069 (or 15.9%) from a close of $0.433 per share on Friday, November 11, 2022 to a close of $0.364 per share on Monday, November 14, 2022.

**False and Misleading Statements**

***May 14, 2021 Registration Statement***

93.     On May 14, 2021, the Company filed the Registration Statement, signed by Defendants VanderZanden and Ling, with the SEC.

94.     The Registration Statement reported that the Company earned $79,941,000 in Sharing revenue for the year ended December 31, 2020.

***October 7, 2021 Prospectus***

95.     On October 7, 2021, the Company filed a prospectus, signed by Defendants VanderZanden and Mutrie, on Form 424(b)(3) with the SEC (the "Prospectus"). Defendants Mutrie, McNeill, Carter, Gieselman, Stoutner, Deutch, Kubis, and Owodunni solicited the Prospectus, which contained material misstatements and omissions.

96.     The Prospectus called for Company shareholders to vote to, *inter alia*: (1) approve the Business Combination and adopt the Business Combination Agreement, dated as of May 11, 2021; and (2) approve and adopt the Bird Global, Inc. 2021 Incentive Award Plan (the "2021 Plan").

97.     The Prospectus also reported that the Company earned $79,941,000 in Sharing revenue for the year ended December 31, 2020.

98.     The above statements in the Prospectus were false and misleading because they failed to disclose, *inter alia*, that: (1) the Company was inaccurately recording Sharing revenue on certain trips taken by customers of the Company's Sharing business; (2) as a result, the Company was overstating its Sharing revenue to the investing public; (3) the Company's internal controls were ineffective and inadequate in terms of accurately recording and reporting Sharing revenue; (4) accordingly, the Company was in need of restating the Sharing revenue it reported as having earned in its SEC filings throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

99.    As a result of the material misstatements and omissions contained in the Prospectus, Company shareholders voted, *inter alia*, to: (1) approve the Business Combination and adopt the Business Combination Agreement; and (2) approve and adopt the 2021 Plan, allowing certain of the Individual Defendants to be greatly unjustly compensated.

### November 15, 2021 Quarterly Report

100.    On November 15, 2021, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendants VanderZanden and Ling, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants VanderZanden and Ling attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

101.    The 3Q21 10-Q reported that the Company earned $64,027,000 in Sharing revenue for the quarter ended September 30, 2021.

### March 15, 2022 Annual Report

102.    On March 15, 2022, the Company filed an annual report on Form 10-K with the SEC for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by each of the Individual Defendants and contained SOX certifications signed by Defendants VanderZanden and Ling attesting to the accuracy of the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

103.    The 2021 10-K reported that the Company earned $187,327,000 in Sharing revenue for the year ended December 31, 2021.

### April 26, 2022 Proxy Statement

Verified Shareholder Derivative Complaint

104.   On April 26, 2022, the Company filed the 2022 Proxy Statement. Defendants VanderZanden, Botha, Friedland, Kan, Komin, Mutrie, Russell, and Sacks solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

105.   The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Botha and Sacks to the Board; and (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2022.

106.   Under the heading "Board Leadership Structure and Role in Risk Oversight," the 2022 Proxy Statement stated the following, in relevant part:

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the Board of Directors at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight. As provided in the Audit Committee Charter, the Audit Committee is responsible for discussing the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled. In accordance with those policies, the Board and the Board committees have an active role in overseeing management of the Company's risks. The Board regularly reviews information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. The Company's Compensation Committee is responsible for overseeing the management of risks relating to the Company's executive compensation plans and arrangements. The Company's Audit Committee oversees management of financial reporting and related risks. The Nominating and Corporate Governance Committee manages risks

associated with the independence of the Board and potential conflicts of interest. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

107. The 2022 Proxy Statement also detailed the responsibilities of the Audit Committee, which at that time consisted of Defendants Komin, Botha, and Mutrie. These responsibilities included the following:

- overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC;
- reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements;

108. With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated:

We have a Code of Business Conduct and Ethics that applies to all of our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. The Code of Business Conduct and Ethics is available on our Investor Relations website, *ir.bird.co*. We intend to make any legally required disclosures regarding amendments to, or waivers of, provisions of our Code of Business Conduct and Ethics on our website rather than by filing a Current Report on Form 8-K.

109. The above statements in the 2022 Proxy Statement were false and misleading because they failed to disclose that: (1) contrary to the 2022 Proxy Statement's description of the Board's risk oversight function, the Board failed in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties; (2) contrary to the 2022 Proxy Statement's description of the Audit Committee's responsibilities, the Audit Committee was not adequately exercising these functions, was causing or permitting the Company to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were

breaching their fiduciary duties; and (3) although the Company claimed the Code of Conduct applied to all officers and directors and that it would disclose any waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed.

110.   The above statements in the 2022 Proxy Statement were false and misleading because they also failed to disclose, *inter alia*, that: (1) the Company was inaccurately recording Sharing revenue on certain trips taken by customers of the Company's Sharing business; (2) as a result, the Company was overstating its Sharing revenue to the investing public; (3) the Company's internal controls were ineffective and inadequate in terms of accurately recording and reporting Sharing revenue; (4) accordingly, the Company was in need of restating the Sharing revenue it reported as having earned in its SEC filings throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

111.   As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) elect Defendants Botha and Sacks to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2022.

### *May 16, 2022 Quarterly Report*

112.   On May 16, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2022 (the "1Q22 10-Q"). The 1Q22 10-Q was signed by Defendants VanderZanden and Ling and contained SOX certifications signed by them attesting to the accuracy of the 1Q22 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

113.   The 1Q22 10-Q reported that the Company earned $33,577,000 in Sharing revenue for the quarter ended March 31, 2022.

### *August 15, 2022 Quarterly Report*

114.   On August 15, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2022 (the "2Q22 10-Q"). The 2Q22 10-Q was signed by Defendants VanderZanden and Ling and contained SOX certifications signed by them attesting to the accuracy of the 2Q22 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

115.   The 2Q22 10-Q reported that the Company earned $72,395,000 in Sharing revenue for the quarter ended June 30, 2022.

116.   The statements referenced in ¶¶93-94, ¶97, ¶¶100-103, and ¶¶112-115 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company was inaccurately recording Sharing revenue on certain trips taken by customers of the Company's Sharing business; (2) as a result, the Company was overstating its Sharing revenue to the investing public; (3) the Company's internal controls were ineffective and inadequate in terms of accurately recording and reporting Sharing revenue; (4) accordingly, the Company was in need of restating the Sharing revenue it reported as having earned in its SEC filings throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Emerges**

### *November 14, 2022 Current Report*

117.   On November 14, 2022, the Company filed a current report on Form 8-K with the SEC announcing that the Audit Committee, after discussing with management, had

determined that the Company's consolidated financial statements included in various SEC filings throughout the Relevant Period were no longer able to be relied upon. The current report also disclosed that any other public statements made by the Company regarding its financial results as reported in its SEC filings throughout the Relevant Period similarly were no longer able to be relied upon. Specifically, the current report disclosed:

> On November 11, 2022, the Audit Committee of the Board of Directors (the "Audit Committee") of Bird Global, Inc. (the "Company"), after discussion with management, determined that (i) the Company's audited consolidated financial statements as of December 31, 2021 and 2020, and for the years then ended, and quarterly periods within those years, included in the Annual Report on Form 10-K filed with the Securities and Exchange Commission (the "SEC") on March 15, 2022, (ii) its condensed consolidated financial statements as of March 31, 2022, and for the three months then ended, included in the Quarterly Report on Form 10-Q filed with the SEC on May 16, 2022 and (iii) its condensed consolidated financial statements as of June 30, 2022, and for the three and six months then ended, included in the Quarterly Report on Form 10-Q filed with the SEC on August 15, 2022 (collectively, the "Original Filings", and each such quarterly or annual period covered therein, an "impacted period"), ***should no longer be relied upon. Similarly, any previously furnished or filed reports, related earnings releases, investor presentations or similar communications of the Company describing the Company's financial results contained in the Original Filings should no longer be relied upon.***
>
> The determination ***results from an error identified in connection with the preparation of the Company's condensed consolidated financial statements as of September 30, 2022, and the three and nine months then ended, related to its business system configuration that impacted the recognition of revenue on certain trips completed by customers of its Sharing business ("Rides") for which collectability was not probable.*** Specifically, for certain customers with insufficient preloaded "wallet" balances, the Company's business systems recorded revenue for uncollected balances following the completion of certain Rides ***that should not have been recorded.*** The Company believes ***the error resulted in an overstatement of Sharing revenue in the consolidated statements of operations for the impacted periods and an understatement of deferred revenue in the consolidated balance sheets as of the end of each impacted period.***

The Company intends to amend the Original Filings as soon as practicable. In connection with the restatement, management has re-evaluated the effectiveness of the Company's disclosure controls and procedures. ***Management has concluded that the Company's disclosure controls and procedures are not effective at a reasonable assurance level, due to a material weakness in its internal control over financial reporting related to the ineffective design of controls around its business systems that resulted in the recording of revenue for uncollected balances following the completion of certain Rides that should not have been recorded.*** The Company is in the process of designing and implementing controls to remediate these deficiencies.

(Emphasis added).

118.   On this news, the Company's share price dropped $0.069 (or 15.9%) from a close of $0.433 per share on Friday, November 11, 2022 to a close of $0.364 per share on Monday, November 14, 2022.

## DAMAGES TO BIRD

119.   As a direct and proximate result of the Individual Defendants' conduct, Bird will lose and expend many millions of dollars.

120.   Such expenditures include, but are not limited to, the costs, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers and directors, any governmental investigations, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

121.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

122.   As a direct and proximate result of the Individual Defendants' conduct, Bird has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment and other violations of law.

## DERIVATIVE ALLEGATIONS

123.   Plaintiff brings this action derivatively and for the benefit of Bird to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Bird, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

124.   Bird is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

125.   Plaintiff is, and has been at all relevant times, a shareholder of Bird. Plaintiff will adequately and fairly represent the interests of Bird in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

126.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

127.   A pre-suit demand on the Board of Bird is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following seven individuals: Defendants VanderZanden, Komin, Mutrie, and Russell (the "Director-Defendants"), and non-parties John Ivan Bitove, Antonio Occhionero, and Kevin Talbot (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

128.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

129.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended, *inter alia*, to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

130.   Additional reasons that demand on Defendant VanderZanden is futile follow. Defendant VanderZanden has served as the Company's Chairman of the Board since November 4, 2021. He served as the Company's President from November 4, 2021 until June 29, 2022. He also served as the Company's CEO from November 4, 2021 until September 21, 2022. Defendant VanderZanden founded Bird Rides in 2017, and previously served as President and CEO and as a director of Bird Rides from 2017 until November 4, 2021. The Company provides Defendant VanderZanden with his principal occupation for which he receives handsome compensation as detailed above. As President, CEO, and Chairman of the Board, Defendant VanderZanden was ultimately responsible for the many false and misleading statements and omissions that were made, including those contained in the 3Q21 10-Q, 2021 10-K, 1Q22 10-Q, and 2Q22 10-Q, which he personally signed and signed SOX certifications for. Moreover, Defendant VanderZanden signed, and thus personally made, the false and misleading statements contained in the Registration Statement and Prospectus. The 2022 Proxy Statement, which contained false and misleading statements, was solicited on his behalf and led to the elections of Defendants Botha and Sacks to the Board, allowing them to breach their fiduciary duties. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant VanderZanden is

a defendant in the Securities Class Action. For these reasons, Defendant VanderZanden breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131. Additional reasons that demand on Defendant Komin is futile follow. Defendant Komin has served as a Company director since November 4, 2021. He previously served as a director of Bird Rides from June 2021 until November 4, 2021. Defendant Komin also serves as the Chair of the Audit Committee. Defendant Komin has received and continues to receive substantial compensation for his role as a director as described above. Moreover, Defendant Komin signed, and thus personally made, the false and misleading statements in the 2021 10-K. The 2022 Proxy Statement, which contained false and misleading statements, was solicited on his behalf and led to the elections of Defendants Botha and Sacks to the Board, allowing them to breach their fiduciary duties. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Komin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132. Additional reasons that demand on Defendant Mutrie is futile follow. Defendant Mutrie has served as a Company director since November 4, 2021. He co-founded Switchback in 2020 and previously served as Switchback's Co-CEO from December 2020 until November 4, 2021 and as a director of Switchback from October 2020 until November 4, 2021. Defendant Mutrie also serves as a member of the Audit Committee. Moreover, Defendant Mutrie signed, and thus personally made, the false and misleading statements in the Prospectus and 2021 10-K. The 2022 Proxy Statement, which contained false and misleading statements, was solicited on his behalf and led to the elections of Defendants Botha and Sacks to the Board, allowing them to breach their

fiduciary duties. Defendant Mutrie also solicited the Prospectus, which led to shareholders approving the Business Combination and the 2021 Plan, under which 17,610,000 Management Reserve shares were granted to Defendant VanderZanden. Moreover, concurrently with the consummation of the Business Combination, Defendant Mutrie purchased 430,000 shares of Company stock for a purchase price of $10.00 per share. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Mutrie breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133. Additional reasons that demand on Defendant Russell is futile follow. Defendant Russell has served as a Company director since November 4, 2021. She previously served as a director of Bird Rides from February 2021 until November 4, 2021. Defendant Russell also serves as a member of the Audit Committee. She has received and continues to receive compensation for her role as a director as described above. Moreover, Defendant Russell signed, and thus personally made, the false and misleading statements in the 2021 10-K. The 2022 Proxy Statement, which contained false and misleading statements, was solicited on her behalf and led to the elections of Defendants Botha and Sacks to the Board, allowing them to breach their fiduciary duties. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Russell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

134. Additional reasons that demand on the Board is futile follow.

135.    Demand in this case is excused because the Directors are beholden to and controlled by Defendant VanderZanden, who beneficially owns approximately 74% of the combined voting power of the Company's outstanding common stock. As a result, the Company is a "controlled company" within the meaning of the NYSE corporate governance standards. Accordingly, as stated in the 2021 10-K, Defendant VanderZanden is able to control matters submitted to the Company's stockholders for approval, including the election of directors, amendments of the Company's organizational documents and any merger, consolidation, sale or all or substantially all of the Company's assets or other major corporate transactions. Moreover, this concentrated control may have the effect of delaying, preventing, or deterring a change in control of the Company. Thus, Defendant VanderZanden wields significant control over the continued employments of the Directors. The Directors are also beholden to Defendant VanderZanden because of the compensation they receive as Directors. As a result, the Directors are unable to evaluate a demand with disinterest or independence due to Defendant VanderZanden's control over them.

136.    Defendants Komin, Mutrie, and Russell (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the design and implementation of the Company's internal audit function, and the performance of the internal audit function after it has been established. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

137.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records including financial records, disclose accurate and complete information regarding Bird's business, financial condition, and results of operations, and comply with laws and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

138.   Bird has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Bird any part of the damages Bird suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

139.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

140.   The acts complained of herein constitute violations of fiduciary duties owed by Bird's officers and directors, and these acts are incapable of ratification.

141.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Bird. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of Bird, there would be no directors' and officers' insurance protection.  Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

142.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Bird to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

143.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Defendants VanderZanden, Botha, Friedland, Kan, Komin, Mutrie, Russell, Sacks, McNeill, Carter, Geiselman, Stoutner, Deutch, Kubis, and Owodunni for Violations of Section 14(a) of the Exchange Act**

144.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of Defendants VanderZanden, Botha, Friedland, Kan, Komin, Mutrie, Russell, Sacks, McNeill, Carter, Gieselman, Stoutner, Deutch, Kubis, and Owodunni. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

146.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

147.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

148.   Under the direction and watch of Defendants Mutrie, McNeill, Carter, Gieselman, Stoutner, Deutch, Kubis, and Owodunni, the Prospectus failed to disclose, *inter alia*, that: (1) the Company was inaccurately recording Sharing revenue on certain trips taken by customers of the Company's Sharing business; (2) as a result, the Company was overstating its Sharing revenue to the investing public; (3) the Company's internal controls

were ineffective and inadequate in terms of accurately recording and reporting Sharing revenue; (4) accordingly, the Company was in need of restating the Sharing revenue it reported as having earned in its SEC filings throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

149.    The false and misleading elements of the Prospectus led to Company shareholders voting, *inter alia*, to: (1) approve the Business Combination and adopt the Business Combination Agreement; and (2) approve and adopt the 2021 Plan, allowing certain of the Individual Defendants to be greatly unjustly compensated.

150.    Moreover, under the direction and watch of Defendants VanderZanden, Botha, Friedland, Kan, Komin, Mutrie, Russell, and Sacks, the 2022 Proxy Statement failed to disclose, *inter alia*, that: (1) contrary to the 2022 Proxy Statement's description of the Board's risk oversight function, the Board failed in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties; (2) contrary to the 2022 Proxy Statement's description of the Audit Committee's responsibilities, the Audit Committee was not adequately exercising these functions, was causing or permitting the Company to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary duties; and (3) although the Company claimed the Code of Conduct applied to all officers and directors and that it would disclose any waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed.

151.    Furthermore, under the direction and watch of Defendants VanderZanden, Botha, Friedland, Kan, Komin, Mutrie, Russell, and Sacks, the 2022 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company was inaccurately recording Sharing revenue on certain trips taken by customers of the Company's Sharing business; (2) as a result, the Company was overstating its Sharing revenue to the investing public; (3) the Company's

internal controls were ineffective and inadequate in terms of accurately recording and reporting Sharing revenue; (4) accordingly, the Company was in need of restating the Sharing revenue it reported as having earned in its SEC filings throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

152.    In the exercise of reasonable care, Defendants VanderZanden, Botha, Friedland, Kan, Komin, Mutrie, Russell, and Sacks should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement.

153.    The false and misleading elements of the 2022 Proxy Statement led to Company shareholders voting, *inter alia*, to: (1) elect Defendants Botha and Sacks to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2022.

154.    The Company was damaged as a result of Defendants VanderZanden's, Botha's, Friedland's, Kan's, Komin's, Mutrie's, Russell's, Sacks', McNeill's, Carter's, Gieselman's, Stoutner's, Deutch's, Kubis', and Owodunni's material misrepresentations and omissions in the Prospectus and the 2022 Proxy Statement.

155.    Plaintiff on behalf of Bird has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

156.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Bird's business and affairs.

158.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

159.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Bird.

160.   In breach of their fiduciary duties owed to Bird, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was inaccurately recording Sharing revenue on certain trips taken by customers of the Company's Sharing business; (2) as a result, the Company was overstating its Sharing revenue to the investing public; (3) the Company's internal controls were ineffective and inadequate in terms of accurately recording and reporting Sharing revenue; (4) accordingly, the Company was in need of restating the Sharing revenue it reported as having earned in its SEC filings throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

161.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

162.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

163.   Moreover, during the Relevant Period, one of the Individual Defendants breached his fiduciary duties by engaging in insider sales for proceeds of $474,578.

164.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Bird's securities and disguising insider sales.

165.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Bird's securities and disguising insider sales.

166.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

167.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Bird has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168.   Plaintiff on behalf of Bird has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

169.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Bird.

171.   The Individual Defendants either benefitted financially from the improper conduct and their engaging in insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Bird that was tied to the performance or artificially inflated valuation of Bird, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

172.   Plaintiff, as a shareholder and a representative of Bird, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

173.   Plaintiff on behalf of Bird has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

174.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Bird, for which they are legally responsible.

176.   As a direct and proximate result of the Individual Defendants' abuse of control, Bird has sustained significant damages. As a direct and proximate result of the

Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Bird has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177.   Plaintiff on behalf of Bird has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

178.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Bird in a manner consistent with the operations of a publicly-held corporation.

180.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Bird has sustained and will continue to sustain significant damages.

181.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

182.   Plaintiff on behalf of Bird has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

183.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

185.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

186.   Plaintiff on behalf of Bird has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants VanderZanden and Ling for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

187.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.   Bird, along with Defendants VanderZanden and Ling, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants VanderZanden and Ling's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or directors of Bird.

189.   Defendants VanderZanden and Ling, because of their positions of control and authority as controlling shareholder, officers, and/or directors of Bird, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Bird, including the wrongful acts complained of herein and in the Securities Class Action.

190.   Accordingly, Defendants VanderZanden and Ling are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

191.   As such, Bird is entitled to receive all appropriate contribution or indemnification from Defendants VanderZanden and Ling.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Bird, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Bird;

(c)     Determining and awarding to Bird the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Bird and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Bird and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2. a provision to permit the shareholders of Bird to nominate at least four candidates for election to the board; and

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Bird restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

1

## **<u>JURY TRIAL DEMANDED</u>**

2

3
Plaintiff hereby demands a trial by jury.

4

5
    Dated: March 17, 2023          Respectfully submitted,

6
                                      **THE BROWN LAW FIRM, P.C.**

7
                                      */s/ Robert C. Moest*

8
                                      Robert C. Moest, Of Counsel, SBN 62166
                                      2530 Wilshire Boulevard, Second Floor

9
                                      Santa Monica, California 90403

10
                                      Telephone: (310) 915-6628
                                      Facsimile: (310) 915-9897

11
                                      Email: RMoest@aol.com

12
                                      **THE BROWN LAW FIRM, P.C.**

13
                                      Timothy Brown

14
                                      767 Third Avenue, Suite 2501
                                      New York, NY 10017

15
                                      Telephone: (516) 922-5427

16
                                      Facsimile: (516) 344-6204
                                      Email: tbrown@thebrownlawfirm.net

17

18
                                      *Counsel for Plaintiff*

19

20

21

22

23

24

25

26

27

28

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I,      Ashkan Farazmand  am     a      plaintiff   in    the  within         action.

I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2023.

3/12/2023

DocuSigned by:

Ashkan Farazmand

303A3593B7C6424...

Ashkan Farazmand